**PIGOTT** et al.

v.

**DETROIT, T. & I. R. CO.** et al.

Civ. A. No. 12130.

United States District Court
E. D. Michigan, S. D.

Nov. 10, 1953.

———◆———

William A. Rhodes, Detroit, Mich., for plaintiffs.

Frederick C. Nash, Bodman, Longley, Bogle, Armstrong & Dahling, Detroit, Mich., for defendant.

Nicholas J. Rothe, Theodore Sachs, Rothe, Marston, Bohn & Mazey, Detroit, Mich., for intervening defendant.

LEVIN, District Judge.

This matter arises on a motion of the intervening defendant, the Brotherhood of Railroad Trainmen (hereinafter referred to as the Brotherhood), to dismiss the complaint herein and the restraining order issued pursuant thereto.

The Brotherhood is the bargaining representative, as authorized by the Railway Labor Act, 45 U.S.C.A. § 152, Fourth, of certain crafts and classes of the employees of the defendant, Detroit, Toledo & Ironton Railroad Company (hereinafter referred to as the Railroad). The eleven plaintiffs, employees of the Railroad, belong to a rival union, United Railroad Operating Crafts (hereinafter referred to as U.R.O.C.).

Pursuant to § 152, Eleventh of the Act,[1] the Brotherhood and the Railroad

---

1. 45 U.S.C.A. § 152, Eleventh.

"Notwithstanding any other provisions of this chapter, or of any other statute or law of the United States, or Territory thereof, or of any State, any carrier or carriers as defined in this chapter and a labor organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this chapter shall be permitted—

"(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class: *Provided*, That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member *or* with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership.

"(b) to make agreements providing for the deduction by such carrier or carriers from the wages of its or their employees in a craft or class and payment to the labor organization representing the craft or class of such employees, of any periodic dues, initiation fees, and assessments (not including fines and penalties) uni-

formly required as a condition of acquiring or retaining membership: *Provided*, That no such agreement shall be effective with respect to any individual employee until he shall have furnished the employer with a written assignment to the labor organization of such membership dues, initiation fees, and assessments, which shall be revocable in writing after the expiration of one year or upon the termination date of the applicable collective agreement, whichever occurs sooner.

"(c) The requirement of membership in a labor organization in an agreement made pursuant to subparagraph (a) of this paragraph shall be satisfied, as to both a present or future employee in engine, train, yard, or hostling service, that is, an employee engaged in any of the services or capacities covered in the First division of subsection (h) of section 153 of this title, defining the jurisdictional scope of the First Division of the National Railroad Adjustment Board, if said employee shall hold or acquire membership in any one of the labor organizations, national in scope, organized in accordance with this chapter and admitting to membership employees of a craft or class in any of said services; and no agreement made pursuant to subparagraph (b) of this paragraph shall provide for deductions from his wages for periodic dues, initiation fees, or assessments payable to any labor organization other than that in which he holds membership: *Provided, however*, That as to an employee in any of said services on a particular carrier at the effective

entered into a union shop agreement requiring all employees of the crafts and classes represented by the Brotherhood to become members of the Brotherhood within sixty days after their employment or after the effective date of the agreement, whichever is later. The agreement excepts, as required by the statute, from the necessity of joining the Brotherhood those employees who belong to another labor organization which is national in scope and organized in accordance with the Act and which admits to membership employees of a craft or class in engine, train, yard, or hostling service, and also excepts certain other employees with whom we are not here concerned.

It is not denied that the Brotherhood is the authorized bargaining agent for the crafts and classes to which the plaintiffs belong. However, relying upon the foregoing statutory exception, incorporated into the agreement between the Brotherhood and the Railroad, plaintiffs contend that U.R.O.C. is a labor organization, national in scope and organized in accordance with the Act,[2] and, as members of U.R.O.C., they are relieved of the necessity of joining the Brotherhood.

Upon the initiative of the Brotherhood, the matter of these eleven plaintiffs was scheduled for a hearing before a system adjustment board established by the union shop agreement to adjudicate disputes arising thereunder. This board was constituted of one representative of the Brotherhood and one representative of the Railroad. After the hearing, at which plaintiffs appeared, the board decided that U.R.O.C. was not a labor organization, national in scope and organized in accordance with the Act, and that the plaintiffs were not in compliance with the union shop agreement.

To forestall their imminent discharge by the Railroad, the plaintiffs, on their own behalf and on behalf of all U.R.O.C. members similarly situated, commenced this action against the Railroad requesting, among other things, a declaratory judgment that U.R.O.C. is a labor organization, national in scope and organized in accordance with the Act; that the agreement entered into between the Railroad and Brotherhood is "unenforceable or inoperative" as to plaintiffs; that the determination of the system board ordering the discharge of the plaintiffs be declared to have been "irregular, arbitrary, against public policy, and its findings unenforceable"; and that the Railroad be permanently restrained from discharging plaintiffs. An order was granted restraining the Railroad from interfering with their employment status. It is this complaint and the restraining order which the Brotherhood now seeks to have dismissed on the ground that this Court is without jurisdiction.

The Railway Labor Act, an early example of legislation affecting employer-employee relations, was enacted in its present form in 1934. At that time it contained no provision for union shop agreements. In 1951 Congress adopted Section 152, Eleventh as an amendment to the Act authorizing the inclusion of a

---

date of any such agreement on a carrier, who is not a member of any one of the labor organizations, national in scope, organized in accordance with this chapter and admitting to membership employees of a craft or class in any of said services, such employee, as a condition of continuing his employment, may be required to become a member of the organization representing the craft in which he is employed on the effective date of the first agreement applicable to him: *Provided, further,* That nothing herein or in any such agreement or agreements shall prevent an employee from changing membership from one organization to another organization admitting to membership employees of a craft or class in any of said services.

"(d) Any provisions in paragraphs Fourth and Fifth of this section in conflict herewith are to the extent of such conflict amended. As amended Jan. 10, 1951, c. 1220, 64 Stat. 1238."

2. It is conceded that U.R.O.C. admits to membership employees of crafts or classes in engine, train, yard or hostling service, and that question is not in issue here.

union shop requirement in a collective bargaining agreement. This section, however, excepts employees who belong to certain other unions from the necessity of joining the organization of the bargaining representative. To define when such alternative unions were so qualified that membership therein would except an employee from the union shop requirement, the drafters of this amendment incorporated into Section 152, Eleventh the identical qualifications as had originally been set out in Section 153, First, (a),[3] which section denotes which labor organizations are qualified to participate in the selection of labor representatives to the National Railroad Adjustment Board. In both sections, the labor organization must be national in scope and organized in accordance with the Act.

However, Section 152, Eleventh is silent as to the manner in which these qualifications are to be determined. On the other hand, Section 153 establishes a specific administrative procedure for that purpose. There is a compelling inference that, when the identical qualifications of Section 153 were incorporated into Section 152, Eleventh the drafters of this amendment also had the administrative procedure of Section 153 for determining these qualifications clearly in mind.

This procedure (see footnote 3) requires that a labor organization desiring to participate in the selection of the labor representatives to the National Railroad Adjustment Board first apply to those labor organizations which are already participating and which select and prescribe the rules under which are

3. 45 U.S.C.A. § 153, First.
"There is hereby established a Board, to be known as the 'National Railroad Adjustment Board', the members of which shall be selected within thirty days after June 21, 1934, and it is hereby provided—
"(a) That the said Adjustment Board shall consist of thirty-six members, eighteen of whom shall be selected by the carriers and eighteen by such labor organizations of the employees, national in scope, as have been or may be organized in accordance with the provisions of section 152 of this title.
"(b) The carriers, acting each through its board of directors or its receiver or receivers, trustee or trustees, or through an officer or officers designated for that purpose by such board, trustee or trustees, or receiver or receivers, shall prescribe the rules under which its representatives shall be selected and shall select the representatives of the carriers on the Adjustment Board and designate the division on which each such representative shall serve, but no carrier or system of carriers shall have more than one representative on any division of the Board.
"(c) The national labor organizations, as defined in paragraph (a) of this section, acting each through the chief executive or other medium designated by the organization or association thereof, shall prescribe the rules under which the labor members of the Adjustment Board shall be selected and shall select such members and designate the division on which each

member shall serve; but no labor organization shall have more than one representative on any division of the Board.
* * * * *
"(f) In the event a dispute arises as to the right of any national labor organization to participate as per paragraph (c) of this section in the selection and designation of the labor members of the Adjustment Board, the Secretary of Labor shall investigate the claim of such labor organization to participate, and if such claim in the judgment of the Secretary of Labor has merit, the Secretary shall notify the Mediation Board accordingly, and within ten days after receipt of such advice the Mediation Board shall request those national labor organizations duly qualified as per paragraph (c) of this section to participate in the selection and designation of the labor members of the Adjustment Board to select a representative. Such representative, together with a representative likewise designated by the claimant, and a third or neutral party designated by the Mediation Board, constituting a board of three, shall within thirty days after the appointment of the neutral member, investigate the claims of the labor organization desiring participation and decide whether or not it was organized in accordance with section 152 of this title and is otherwise properly qualified to participate in the selection of the labor members of the Adjustment Board, and the findings of such boards of three shall be final and binding."

selected the labor members on the National Railroad Adjustment Board.

It may be assumed that the natural hostility of these established unions towards a "new" union would create a bar towards the objective consideration of such applications, and Section 153, First, (f) provides that in the event of a dispute as to such right to participate, the matter can be referred to the Secretary of Labor for investigation of the claim of the "new" union to participate. If such claim has merit in the judgment of the Secretary of Labor, he then notifies the National Mediation Board and it arranges for a board of three to determine the right to participate. This board consists of one member designated by the labor organizations already participating, one member by the labor organization seeking to participate, and a neutral member by the National Mediation Board. The findings of such a three-man board as to whether the petitioning union is national in scope and organized in accordance with the Act are "final and binding."

The establishment of this specific administrative procedure in Section 153 to determine the status of a labor organization is consistent with the general scheme of Congress in the Railway Labor Act that family quarrels shall be privately settled within the confines of the structure erected by the Act. For example, the National Railroad Adjustment Board, also provided for in Section 153 and consisting of eighteen carrier and eighteen labor members chosen by groups participating in the administration of the Act, is authorized [4] to hear disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions.[5] The Act provides that the awards of the National Railroad Adjustment Board (and, by extension, of any system, group, or regional board) "shall be final and binding upon both parties to the dispute, except insofar as they shall contain a money award",[6] and it has been held that the courts do not have jurisdiction over those disputes which Congress has committed to the exclusive jurisdiction of this agency.[7]

Similarly, the National Mediation Board, provided for in Section 154 and consisting of three public members appointed by the President, is authorized,[8]

---

4. 45 U.S.C.A. § 153, First (i).

5. In addition, Section 153, Second authorizes any individual carrier or group of carriers and any class or classes of its or their employees, pursuant to an agreement entered into between their bargaining representatives, to establish, in substitution for the national board, a system, group, or regional board of adjustment. Such a system, group, or regional board would have the same jurisdiction and the same authority over disputes as would the appropriate division of the National Railroad Adjustment Board.

6. 45 U.S.C.A. § 153, First (m).

7. Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795 (dispute between two unions as to scope of respective agreements with same carrier); Order of Railway Conductors of America v. Southern Railway Co., 339 U.S. 255, 70 S.Ct. 585, 94 L.Ed. 811 (dispute between employees and carrier as to interpretation of agreement); Order of Railway Conductors of America v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318 (dispute between two unions as to scope of respective agreements with carrier). In Slocum, 339 U.S. at p. 243, 70 S.Ct. at page 579, the Court says:

"The Act thus represents a considered effort on the part of Congress to provide effective and desirable administrative remedies for adjustment of railroad-employee disputes growing out of the interpretation of existing agreements. The Adjustment Board is well equipped to exercise its congressionally imposed functions. Its members understand railroad problems and speak the railroad jargon. Long and varied experiences have added to the Board's initial qualifications. Precedents established by it, while not necessarily binding, provide opportunities for a desirable degree of uniformity in the interpretation of agreements throughout the nation's railway system."

8. 45 U.S.C.A. § 152, Ninth.

whenever a jurisdictional dispute arises between rival unions, to investigate such dispute and then to certify the union which is to act as bargaining representative for the employees in question. Such certifications are held to be exclusively within the competency of the National Mediation Board and its decisions are conclusive and not subject to review.[9]

In conformance with this settled pattern of the Railway Labor Act, the special administrative procedure of Section 153 must, therefore, be held to be vested with exclusive jurisdiction to determine whether a labor organization is national in scope and organized in accordance with the Act when a dispute arises pursuant to the right of the labor organization to participate in the National Railroad Adjustment Board machinery. The wisdom of Congress in utilizing such a special agency is illustrated by factors, some of which I here list for a better understanding of this legislation:

(a) Whether a labor organization is national in scope is not capable of precise definition. The history of the legislation, the peculiar characteristics of the type of labor organization concerned, the qualifications of other labor organizations already deemed to be qualified and the tensions existing as a result of interunion rivalry must all be taken into consideration. It is the type of issue which those that are conversant with the specialized problems of the railroad industry are most capable of evaluating.

(b) A labor organization which is national in scope would be present in more than one jurisdiction and would have relationships with more than one carrier. If the question of its status were open to the courts, which are located in various areas of the nation, it is conceivable that such different jurisdictions would reach contrary conclusions if concurrent suits with separate carriers were to be litigated. During the delay while matters are being heard and pending the appellate resolution of possibly conflicting results, a serious element of doubt and confusion would be injected into an industry whose uninterrupted operation is essential to the national welfare. The creation of a single, central, competent agency which is itself national in scope and is thus capable of dealing with these problems that touch every state of the union, obviates this risk and makes possible a more speedy determination.

(c) Because of the conflict of interests between the established unions and a "new" union, the National Railroad Adjustment Board is not a competent agency to review the qualifications of such a labor organization. With half of its members selected by the established unions, it is not likely that they would regard with equanimity the claim of a "new" union, a rival to one or more of the members' organizations.[10] This pressure to protect a vested interest would be even greater were the matter to be heard by a system board of the type before which the plaintiffs ap-

**9.** Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61; General Committee v. Missouri-K.-T. R. Co., 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76. In the latter case in 320 U.S. at pages 336–337, 64 S.Ct. at page 152 the Court says:
"However wide may be the range of jurisdictional disputes embraced within § 2, Ninth, Congress did not select the courts to resolve them. To the contrary, it fashioned an *administrative remedy* and left that group of disputes to the National Mediation Board. If the present dispute falls within § 2, Ninth, the administrative remedy is exclusive.
\*　　\*　　\*　　\*　　\*

"In view of the pattern of this legislation and its history the command of the Act should be explicit and the purpose to afford a judicial remedy plain before an obligation enforceable in the courts should be implied."

This result is reached even though Section 152, Ninth is silent as to whether such determinations are to be "final and binding."

**10.** See Comment, 18 University of Chicago Law Review 303, 1950, for an informative discussion on the manner in which representatives on the National Railroad Adjustment Board are motivated by partisanship.

peared in the instant case. That board, as has been stated, was made up of one representative of the Railroad and one representative of the Brotherhood. Furthermore, if each such system board had equal jurisdiction to adjudicate the status of a labor organization, there would be present the same threat of inconsistent results, with a labor organization being considered qualified as to certain carriers and not qualified as to others.

■ The foregoing considerations which prompted Congress to prescribe a separate administrative procedure rather than to rely upon an adjustment board or a judicial determination are equally applicable whether the dispute as to a labor organization's qualifications arises pursuant to its right to participate in the adjustment board machinery or pursuant to its right to the union shop exception. Therefore, despite the absence of an express declaration in Section 152, Eleventh as to how a labor organization's qualifications are to be determined for purposes of the exception to the union shop requirement, I must construe this section so as to make it consistent with the clearly articulated Congressional intention and policy in Section 153 to vest exclusive jurisdiction over such questions in this specific administrative procedure.

But, a labor organization cannot resort directly to this specific administrative machinery of Section 153 for the limited purpose of establishing that its members are entitled to the exception to the union shop requirement. The special agency provided in Section 153, First, (f), consisting of the Secretary of Labor and a three-man board, acquires jurisdiction only when a dispute arises with respect to the right of a labor organization to participate in the adjustment board machinery. To activate this administrative procedure a labor organization must first petition to participate in the selection of representatives to the adjustment board. In the event that this petition is rejected, it can then take its case to the Secretary of Labor and the three-man board. The necessary effect of these provisions is that a labor organization, desirous of qualifying for the exception to the union shop requirement, must also participate in the adjustment board machinery before it can obtain the required stamp of approval from the specific administrative procedure provided in Section 153. Only in this way is the Congressional intention to provide a special administrative determination of these qualifications reconciled with the provisions regulating access to this administrative procedure.

This result is consonant with the intention of the drafters of the union shop amendment that a labor organization shall not be entitled to enlist employees on the basis of the privileged standing accorded to qualified unions in Section 152, Eleventh until it has assumed its fair share of the burdens and responsibilities attendant upon the administration of the Act.[11] Thus, a labor organi-

11. Each union participating in the agencies of the Act must itself pay for the salaries and expenses of its officials who serve in such agencies. This constitutes a considerable financial burden which must be reflected in the dues charged the employees. Unless a labor organization were obliged to participate in the judgment board machinery before it could qualify for the union shop exception, it would place the bargaining representative in an unfair competitive position with respect to a rival union. Employees would be tempted to desert the organization of a bargaining representative which was assuming its responsibilities under the Act in favor of another union which was not contributing to its operation and which could thereby offer cheaper dues. This would defeat the very purpose of the union shop amendment which is to compel each employee to contribute his part to the bargaining representative's activities on his behalf, including its participation in the administrative machinery of the Act. See Testimony of George M. Harrison, representative of the Railway Labor Executives Association in Hearings on Senate Bill 3295, pp. 15 and 16 (May 1950) before a Subcommittee of the Committee on Labor and Public Welfare, United States Senate, 81st Congress, 2d Sess.

zation must exert itself, at least to the extent of participation in the adjustment board machinery, before it is so entitled. It is only by insisting on present participation that a clear and concrete standard is available to guide all interested parties as to the status of a labor organization. With the benefit of such a standard, no employee need risk his seniority or his job by having to join a labor organization first and then to wait for an adjustment board or court proceeding before the status of such rival labor organization is adjudicated. The evil in such a practice is that the employee will be discharged for having failed to join the organization of the bargaining representative if it is finally determined that the rival union is not qualified. In the instant case, the plaintiffs should either have insisted that U. R.O.C. establish its status in the prescribed fashion or have protected their interests by joining the Brotherhood.

■ Not only do I find that this Court is without jurisdiction to decide whether U.R.O.C. is national in scope and organized in accordance with the Act, but I also hold that there is an absence of jurisdiction to decide whether the agreement between the Brotherhood and the Railroad is "unenforceable or inoperative" as to the plaintiffs. Although Congress has removed certain matters regarding the status of a labor organization from the cognizance of the adjustment boards, they still retain exclusive jurisdiction over the interpretation and application of agreements concerning rates of pay, rules or working conditions. The union shop provision of an agreement, executed in conformance with the Act, concerns a rule or working condition governing the employment relationship, and a dispute as to whether an employee should be discharged for failure to comply with such a provision of the agreement is a dispute between an employee and a carrier involving the interpretation and application of an agreement concerning a rule or working condition. The hearing of such a dispute, therefore, is within the exclusive province of the adjustment board.

■ To be sure, in deciding whether the labor organization to which the non-complying employee belongs is national in scope and organized in accordance with the Act, the adjustment board must abide by the determination of such status made through the administrative procedure of Section 153. Because U. R.O.C. was not then participating in the National Railroad Adjustment Board machinery, there was no alternative but for the system board to find that U.R. O.C. was not national in scope and was not organized in accordance with the Act.

■ Since the agreement between the Brotherhood and the Railroad does not purport to confer greater authority upon the system board than authorized by the Act, I am without power to supplant the adjustment board or to review its determinations in these premises. Section 153(m) expressly makes "final and binding" determinations which do not involve a money award. That Congress intended by this declaration to remove from this Court any power under its general grants of jurisdiction to hear such matters is confirmed by Section 153 (p).[12] In this section Congress goes on

12. 45 U.S.C.A. § 153(p)
"If a carrier does not comply with an order of a division of the Adjustment Board within the time limit in such order, the petitioner, or any person for whose benefit such order was made, may file in the District Court of the United States for the district in which he resides or in which is located the principal operating office of the carrier, or through which the carrier operates, a petition setting forth briefly the causes for which he claims relief, and the order of the division of the Adjustment Board in the premises. Such suit in the District Court of the United States shall proceed in all respects as other civil suits, except that on the trial of such suit the findings and order of the division of the Adjustment Board shall be prima facie evidence of the facts therein stated, and except that the petitioner shall not be liable for costs in the district court nor for costs at any subsequent stage of

to declare that a District Court of the United States will have special jurisdiction to review such determinations of the Adjustment Board when the matter arises on a petition to enforce an order of the board. Reading this latter special grant of jurisdiction in the light of the provision making the determinations of the Adjustment Board "final and binding," the conclusion is inescapable that this Court is authorized to review Adjustment Board determinations only under the circumstances and in accordance with the procedures outlined in Section 153(p).[13] The unique character of these boards, in which the adverse parties are equally represented, gives their proceedings more of the quality of a conciliation conference than a quasi-judicial tribunal. For this reason, they are intended to be self-regulating both as to substantive and procedural matters. This informal technique of resolving employer-employee conflicts which Congress has provided for the Railroad industry offers no basis for the application of principles of judicial review.

It is urged upon the Court that there is authority in Steele v. Louisville & Nashville Railroad Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173, for disqualifying the system board and for the assumption of jurisdiction by this Court to protect the alleged invasion of plaintiffs' statutory and constitutional rights. In Steele, the petitioners were Negroes who were protesting against discrimin-atory treatment at the hands of the bargaining representative, and the delegates of this same bargaining representative were sitting on the adjustment board and would pass on the merits of the complaint. There is language in that case to the effect that a hearing before an adjustment board under such circumstances is not an adequate administrative remedy because of the conflict of interest between the labor organization and the employees whom it represents.

In support of this contention that the system board should be disqualified because of a like conflict of interest between the Brotherhood and the plaintiffs, plaintiffs also request that I find that the hearings before the system board were "irregular, arbitrary, against public policy, and its findings unenforceable."

Before the plaintiffs would have standing to request a declaration that the system board is disqualified in this matter, their complaint must allege a controversy, ripe for adjudication, in which it appears that such a holding is indispensable to the protection of their legal rights. Under the Act, plaintiffs are not entitled to their seniority or their employment unless they belong either to the Brotherhood or to another union which has qualified, pursuant to the procedure provided in Section 153, for the exception to the union shop requirement. Since the complaint fails to allege that U.R.O.C. has so qualified,

the proceedings, unless they accrue upon his appeal, and such costs shall be paid out of the appropriation for the expenses of the courts of the United States. If the petitioner shall finally prevail he shall be allowed a reasonable attorney's fee, to be taxed and collected as a part of the costs of the suit. The district courts are empowered, under the rules of the court governing actions at law, to make such order and enter such judgment, by writ of mandamus or otherwise, as may be appropriate to enforce or set aside the order of the division of the Adjustment Board."

13. See Missouri-Kansas-Texas R. Co. v. Brotherhood of Ry. & S. S. Clerks, 7 Cir., 188 F.2d 302, 305:

"Both appellants contend that since § 3, First (p) of the Railway Labor Act, 45 U.S.C.A. § 153, subd. 1 (p), makes special provision for judicial review of awards of the Board, jurisdiction over such reviews is vested only in the courts therein specified and must be exercised in accordance with the procedures therein provided.

"There is no question now but that the courts have absolutely no jurisdiction to interrupt agreements between carriers and their employees or to settle disputes arising out of the construction of such agreements. That principle has been so firmly established by a series of decisions construing § 3 of the Railway Labor Act that we deem it unnecessary even to cite authorities."

plaintiffs' membership in that labor organization does not preserve any right, the protection of which justifies the intervention of this Court.[14]

An order dismissing the complaint and vacating the temporary restraining order will be entered.

---

14. Cf. Order of Railway Conductors of America v. Pitney, 326 U.S. 561, 567, 66 S.Ct. 322, 325:

"The factual question is intricate and technical. An agency especially competent and specifically designated to deal with it has been created by Congress. Under these circumstances the court should exercise equitable discretion to give that agency the first opportunity to pass on the issue. Certainly the ex-traordinary relief of an injunction should be withheld, at least, until then. * * * Only after the Adjustment Board acts, but not until then, can it plainly appear that such relief is necessary to insure compliance with the statute. Until such time, O.R.C. can not show irreparable loss and inadequacy of the legal remedy. The court of equity should, therefore, in the exercise of its discretion stay its hand."